IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:99-HC-856-BO



FILED

NOV 8 2000

DAVID W. DANIEL, CLERK
U.S. DISTRICT COURT
E. DIST. NO. CAR.

MONTOYAE DONTAE SHARPE, )
)
Petitioner, )
)                    RESPONDENT'S RESPONSE
)                    TO NEW ALLEGATIONS
v.                      )                    RAISED IN THE
)                    EVIDENTIARY HEARING
)
MICHAEL T. W. BELL, )
)
Respondent. )


NOW COMES THE RESPONDENT by and through his undersigned attorney
and makes the following response to new evidence raised for the
first time in the evidentiary hearing on October 17, 2000.

This Response was in draft form at the time counsel for the
Petitioner and Respondent met to confer on creating the proposed
list of legal issues submitted on November 1 in the Proposed
Prehearing Conference Order. The undersigned attorney for the
Respondent gave a copy of the draft to Petitioner's attorney,
explaining that it should be taken into account in their listing
of proposed issues, and the legal issues relevant to it were
discussed and included in the Proposed Order.

The Petitioner was convicted in July 1995 of the first
degree murder of George Radcliffe, which occurred in February

1994 in Greenville, North Carolina. After his conviction, Mr.
Sharpe appealed to the North Carolina Supreme Court and the state
court found no error in his trial. Subsequently, the Petitioner
filed a Motion for Appropriate Relief in Pitt County Superior
Court and the court conducted an evidentiary hearing in December
1997. Judge W. Russell Duke, Jr. denied the Motion after hearing
evidence from twelve witnesses.

On October 17, 2000 an evidentiary hearing was commenced in
this Court to examine the matters presented to the Court in the
Petitioner's habeas corpus application. Previously, the
Respondent had answered the Petition and filed a Motion for
Summary Judgment with a Memorandum in support of the Motion. In
the course of the hearing, the Petitioner presented a witness who
had not been heard from at trial or in the course of the
evidentiary hearing conducted pursuant to the Motion for
Appropriate Relief made in the state court. Attorney for the
Petitioner explained they had just discovered this witness. This
witness, Dearil Powell, testified to this Court that he was an
eyewitness more than six years ago to the murder of which
Petitioner was convicted, and that he saw another man, not the
Petitioner, commit the murder in February 1994. (A copy of the
transcript of his testimony is attached as Exhibit A to this

Motion).

The Respondent's undersigned attorney had never been told before the federal evidentiary hearing began that such a witness as Mr. Powell existed. Consequently, she was not prepared to cross-examine him, but she did object to his testimony coming in. When Mr. Powell completed his direct testimony, the Court recessed to recommence with the taking of evidence at another time.

Because no claim dealing with the evidence Mr. Powell presented was raised in any way in the Petition, the Respondent has never had the opportunity to answer allegations related to his story.

The Respondent/State's position in this matter, as it pertains to evidence offered by means of Mr. Powell's testimony, is the following:

(1) The testimony may be offered as an attempt to present a new claim, not previously raised in the Petition or in any prior state proceeding; and if so, it is a non-exhausted claim and should be dismissed. 28 U.S.C. §2254(b)(1)(A).

(2) Furthermore, exhausted or not, if it is presented as a new claim, the claim appears to be a new claim of actual innocence which, standing alone, is not a cognizable

constitutional claim in federal habeas proceedings, as it is not
an allegation that the Petitioner is in custody in violation of
the United States Constitution. 28 U.S.C. §2254(a). *Herrera v.
Collins*, 506 U.S. 390 (1993); *Schlup v. Delo*, 513 U.S. 298
(1995).

(3) On the other hand, there is a mechanism in place in
state court (which remedy again is non-exhausted) designed
precisely to deal with claims of actual innocence based upon
newly discovered evidence. N.C.G.S. §15A-1420(c). In North
Carolina state courts, the General Assembly has provided a
statutorily-created opportunity to bring this matter to the
attention of the State Superior Court, which may call for an
evidentiary hearing to resolve questions of fact, if any.
N.C.G.S §15A-1420(c).

(4)A factual predicate that could not have been previously
discovered is mentioned in the habeas provisions at 28 U.S.C.
§2254(e)(2), but it is not applicable to this situation. That
provision is in reference to a claim already presented in state
court, and is only a gateway for obtaining the opportunity in
federal court to revisit a claim already determined on the merits
in state court. This opportunity is not available to the

Petitioner for several reasons. Namely,

(a) a claim of being in custody in violation of the United States Constitution must rely on the newly presented facts; and

(b) the Petitioner has not and cannot present a constitutional claim relying on this factual predicate because actual innocence is not a constitutional claim. *Herrera, supra.*

(c) Even assuming for the sake of argument that there is an underlying constitutional claim, these facts do not present clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found Petitioner guilty because:

(1) this new post-conviction claim of actual innocence has nothing to do with exposing a trial error and cannot be the *sine qua non* of a conviction, and

(2) regardless, the evidence (Mr. Powell's testimony) is too untrustworthy to establish by clear and convincing evidence that but for an alleged unconstitutional error no reasonable juror would have found Petitioner guilty.

(5) If the testimony of Dearil Powell is admissible, it should be allowed in for one limited purpose; *i.e.*, as evidence

offered to attempt to show a fundamental miscarriage of justice so as to overcome the procedural bar of the ineffective assistance of counsel claim.[1] Evidence of actual innocence may create a showing of a miscarriage of justice and may be presented as a possible gateway through which a habeas petitioner must pass to have his otherwise procedurally barred constitutional claim considered on the merits. *See also*, *Herrera*, at 404. However, this inherently unreliable evidence should not be admitted even for that limited purpose, or if admitted, it should be ruled inadequate for that purpose as a matter of law because so-called "procedural claim of innocence" evidence must be "reliable". *Schlup*, at 324.

The only procedurally barred underlying constitutional claim the Petitioner asserts in the Petition is the ineffective assistance claim, which, it has already been argued in the

---

[1] A petitioner may overcome a procedural bar of a constitutional claim in habeas court by showing that "cause and prejudice" excuse the default, or that a "miscarriage of justice" would be the result of barring the habeas court's review of the merits of a constitutional claim. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Murray v. Carrier*, 477 U.S. 478 (1986). A petitioner must show "some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court to establish "cause". *Murray* at 488. This new evidence has not been directed at showing why appellate counsel defaulted the ineffectiveness of trial counsel claim, and it would not explain the default. "Prejudice" generally is not just the possibility of prejudice from trial errors. A petitioner must show that errors worked to petitioner's substantial disadvantage, infecting the entire trial. *United States v. Frady*, 456 U.S. 152 (1982). This new evidence has not been directed at showing this kind of prejudice. Therefore, the cause and prejudice gateway to the merits of the Petitioner's claim is not available.

Answer, is procedurally barred.[2] The Petitioner can only avoid the procedural bar of that claim if he can show he falls "within the narrow class of cases implicating a fundamental miscarriage of justice." *Schlup*, 314-15. Assuming that although *Schlup* was a capital case the same standard would apply here, this language describes the necessary analysis of the admissibility and purpose of new procedural-claim-of-innocence evidence:

> [I]f a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

*Id.*, at 316. The Court also refers to this as a "threshold showing of innocence" that "would justify a review of the merits of the constitutional claims." *Id.*, at 317.

The necessary showing to cross this threshold is described

---

[2]Since the commencement of the evidentiary hearing, the Petitioner has newly suggested the state court deprived him of due process with its handling of the recantation of Charlene Johnson. This is a non-exhausted claim, but it may not be procedurally barred since N.C.G.S. §15A-1420(c) may provide a state remedy. Therefore, Powell's testimony is not pertinent to the new due process claim as a gateway for obtaining habeas review of its merits. Also, the testimony should not be considered in assessing the merits of the due process claim (if the Court chooses to do so) because Powell's' story, non-existent at the time of Judge Duke's decision about Charlene Johnson's recantation, had no bearing on the fairness of his decision.

thus:[3] When a petitioner raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims,

> The ... standard requires the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.
>
> . . .
>
> In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.... The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.

*Id.*, at 327-28.

Elsewhere, the Court states what support a credible claim would require the petitioner to show:

---

[3]Again, *Schlup* is a capital case and the standard is only presumed here to apply in a non-capital case. However, the *Schlup* standard being what it is for a supposedly innocent man sentenced to death, it is extremely unlikely that a noncapital case would receive the benefit of any lower standard. If the Petitioner cannot reach this threshold, which the Respondent states he cannot, he certainly could not reach any other higher threshold.

> To be credible, such a claim requires petitioner to
> support his allegation of constitutional error with new
> reliable evidence -- whether it be exculpatory
> scientific evidence, trustworthy eyewitness accounts,
> or critical physical evidence -- that was not presented
> at trial.

*Id.*, at 324.

In light of all the other evidence here, the suspiciously coincidental timing of Mr. Powell's availability, and other peculiar circumstances of this case, some of which the Respondent has not yet had the opportunity to present in court, the Petitioner cannot make that threshold showing to establish that he may enter the gateway to avoid the procedural bar of his ineffective assistance claim. The Powell testimony is not the kind of reliable information to indicate actual innocence that the Court contemplated in *Schlup* and *Herrera*. Therefore, despite the new evidence, the procedural bar of the Petitioner's ineffective assistance claim, applied by virtue of an independent and adequate state rule of procedure, continues as a bar to habeas review of the merits of the claim. *Coleman v. Thompson*, 501 U.S. 722 (1991). Even if the new evidence met the threshold requirement for obtaining habeas review of the claim's merits, the underlying ineffectiveness claim has no merit for all the reasons set out in the Memorandum in Support of the Motion for

Summary Judgment.

Respectfully submitted this the 6th day of November, 2000.

Michael F. Easley
ATTORNEY GENERAL

Diane A. Reeves
Assistant Attorney General
State Bar No. 8860
Post Office Box 629
Raleigh, North Carolina 27602
(919)716-6500

PROOF OF SERVICE

I HEREBY CERTIFY that on November 6, 2000, a copy of the foregoing RESPONSE TO NEW ALLEGATIONS was mailed, postage prepaid, to the attorney for the Petitioner, Montoyae Dontae Sharpe:

Kristin D. Parks
N. C. State Bar No. 22243
North Carolina Prisoner Legal Services, Inc.
P. O. Box 25397
Raleigh, North Carolina 27611

Diane A. Reeves
Assistant Attorney General





MICHAEL F. EASLEY
ATTORNEY GENERAL

**State of North Carolina**
Department of Justice
P. O. BOX 629
RALEIGH
27602-0629

REPLY TO: DIANE A. REEVES
CAPITAL LITIGATION SECTION
(VOICE) 919-716-6523
(FAX) 919-716-0001

November 6, 2000

- M E M O R A N D U M -

**TO:**     Ms. Gayle McDowell, Office of the Clerk of Court
United States District Court for the Eastern District, Western Division
Attention: Civil Section

**FROM:**     Diane A. Reeves
Capital Litigation/Federal Habeas Section

**SUBJECT:**     **Montoyae Dontae Sharpe v. Michael T.W. Bell, No. 5:99-HC-856-BO**

Enclosed is an attachment to the Response just filed that I mistakenly left out when the Response was filed. Please file it with the Response if possible, and of course, let me know if that is a problem. Thank you very much for your assistance.

cc:     Petitioner's attorney, Kristin D. Parks





NOV 2000

1    DEARL POWELL, PETITIONER'S WITNESS, SWORN

2          THE COURT:  Spell your first name, please.

3      A.  D-E-A-R-L.

4          MS. REEVES:  Your Honor --

5          THE COURT:  You object to the witness.

6    Overruled.

7          MS. REEVES:  I object for the record and say

8    this is not the place to hear this new evidence claim.  It

9    should be back in state court.

10         THE COURT:  I'll overrule that at this time.

11                DIRECT EXAMINATION

12   BY MS. DORROUGH:

13     Q.  Please state your name for the record.

14     A.  Dearl Powell.

15     Q.  Where do you reside?

16     A.  Where do I stay now?

17     Q.  Were do you reside?

18     A.  1309 Chestnut Street.

19     Q.  Leading back to the year 1994, are you familiar

20   with the Shepherd and 6th Street area?

21     A.  Yes, I lived on 6th Street.

22     Q.  Were you there on the night of February 11,

23   1994?

24     A.  Yes.

25     Q.  What, if anything, did you see?

1      A.    Well, first I see Damien go up to the truck with

2    a gun and demand the money.  He was like, give me the

3    money motherfucker, like that.

4            Am I allowed to say that?

5            **THE COURT:**  You said it.

6      A.    And I don't know if the dude thought he was

7    bluffing or what.  Then all of a sudden he acted like he

8    was going to try to pull off with the truck.  Then the

9    gunshot rang out.  And you see the truck swerve off over

10   there into the little field.  And Marciano he jumps out of

11   the truck.

12     Q.    Who was Marciano?

13     A.    He was the guy in the truck, the little dope-

14   head.

15     Q.    Was anyone else there?

16     A.    Well, Omar he won't like right at the truck, but

17   he was down at the end, like this part of Shepherd Street.

18   And this Beatrice woman, she was on the other end like

19   Douglas and Shepherd.

20     Q.    How do you know who Beatrice is?

21     A.    Well, I always seen Beatrice.  I didn't never

22   like really know her name.  I always seen her in the area

23   like, cause she a dope-fiend or whatever.

24     Q.    Where were you at when you observed all of this

25   occurring?

1   A.   The truck was right here, and there's a house

2   right here, and I'm right beside the house right here, but

3   it's like the porch is like down right here like my upper

4   body could stand over the porch, and I could see what was

5   going on.

6   Q.   What did you do -- what, if anything, did you do

7   after you observed this shooting?

8   A.   When the shot rang out, see, back over there if

9   people see something, they'll be trying to get you or

10  whatever.  So when I seen Damien shoot my man I get behind

11  the house a little bit cause I ain't want them to see me.

12  Because my house is like two houses down from the event

13  where it happened.

14  Q.   How old were you at this time?

15  A.   I was 18.

16  Q.   After you saw the shooting, what happened?

17  A.   Damien jetted one way.  Omar jetted another way.

18  Beatrice jetted like -- Marciano jetted away toward like

19  14th way, and I said a good ten, whatever, how many

20  minutes it was, police showed up or whatever.

21          THE COURT:  Jetted is slang for left.

22  A.   Yes.

23          THE COURT:  Let the scene, took off?

24  A.   Yeah.

25  Q.   What, if anything, did you do after you saw this

1  man shot?

2      A.   Really, I mean, I waited for a few minutes until

3  they got away cause I didn't want nobody to see me, and I

4  went to the crib.

5      Q.   How did you know who Damien was?

6      A.   Because I had seen Damien a little earlier that

7  day.  He still had on the same old thing, whatever.  Cause

8  I had came to KP earlier that day.

9      Q.   What's KP.

10     A.   That's Kerner Park.  And later on that day when

11  I came out about five o'clock, the streets -- it was a

12  little crowded then but when that junk happened wasn't

13  nobody else out there but, let me see, one, two, about a

14  good four people.

15     Q.   Do you recall what the weather was like on that

16  day?

17     A.   It was drizzling or whatever.

18     Q.   Mr. Powell, after you witnessed this man shot,

19  why didn't you come forward with your story?

20     A.   Because I have a twin brother.  And on that west

21  side of Greenville, anything goes.  Cause it seemed like

22  once that murder happened a lot of other murders started

23  happening but they were knocking at the wrong people.  And

24  the murderer is still out there right now.

25     Q.   What type of contact did you have -- what, if

1   any contact did you have with Damien or Omar or Marciano

2   after you saw this murder?

3       A.   I never had no contact with them.  Two or three

4   days later I seen Damien back up in the area, but he was

5   on 14th Street then, and I was coming from 6th Street, but

6   I took the way of McKinley Avenue down at Douglas and I

7   was going on 4th Street to see this girl.  And Damien was

8   standing -- it was raining that day too, and he was

9   standing in the rain.  And I was thinking that he would

10  try to do something to me.

11      Q.   Why did you think he would try to do something

12  to you?

13      A.   He was looking in my direction, and I says, this

14  dude must have knew that I was out there or whatever, you

15  know, somebody probably seen me or whatever, you know.

16  And anything went down that day, we would have shot each

17  other.

18      Q.   Why didn't you go to the police with this

19  information?

20      A.   Just like I said, I got a twin brother.  He

21  normally roams the streets over there.  Like we're out in

22  the street at the same time getting money too, you know.

23  And I always hear about the wrong twin getting killed when

24  I was coming up because they was after this twin.  That's

25  why.

1       Q.   Were you afraid of Damien Smith?

2       A.   No, I ain't afraid of nobody, but I don't want

3  to be put on trial for nothing where I can avoid, you

4  know, and I don't mean to avoid this situation so long,

5  because that's an innocent man.  And I know he's innocent.

6       Q.   Mr. Powell, this murder happened six years ago.

7  Why are you coming forward now with this?

8       A.   Well, really I was thinking that they had

9  Dontae, and I was like, they ain't gonna convict that man

10 because what evidence they got to say Dontae done it, you

11 know, or show he was there.  He weren't on that block none

12 that day, none that day.

13      Q.   Are you friends with Mr. Sharpe?

14      A.   Well, I always knew him, but I just knew of him,

15 you know.  I never hung out with him or none of that

16 stuff.

17      Q.   Are you friends with anyone in his family?

18      A.   Well, me and his brother, Jamal, we met each

19 other on the basketball court and that's as far as it.

20 Because he go to school one way, and I go to school

21 another way.

22      Q.   You all weren't close friend?

23      A.   No, not when you say close like hangin' out or

24 partying or none of that stuff.

25           MS. DORROUGH:  Your Honor, I don't have any

1  further questions.

2         **THE COURT:** Any questions?

3         **MS. REEVES:** Your Honor, would it be possible

4  for me to talk to our investigators and Mr. Everett for

5  five minutes. This, of course, is a complete surprise to

6  us, and I would like to see if there is anything that they

7  could suggest in the way of questions that I should ask.

8         **THE COURT:** Well, we can recess and have you

9  examine this witness when we reschedule, give you an

10  opportunity to do your investigation that way.

11         **MS. REEVES:** I appreciate that.

12         **THE COURT:** I think that might be a better

13  course. Of course he has testified here under oath. So

14  he has got something at stake, too.

15         **MS. REEVES:** Yes, sir, I'm aware of that.

16         **THE COURT:** I mean, if you have told the truth,

17  then that's --

18    A.    Have I told the truth?

19         **THE COURT:** Are you listening to me or talking?

20    A.    I was talking to her.

21         **THE COURT:** Well, don't. I'm telling you

22  something right now. If you have told the truth, then

23  that's a matter of some significance. If you have

24  perjured yourself here in United States Court, then that's

25  a matter of some significance. You don't need to say

1    anything.  In fact, I wouldn't say anything.

2         A.   All right.

3              **THE COURT:**  Well, I think that will be the

4    evidence right now.  You can step down.  We will recess

5    this and reconvene it at a later time.  Just keep your

6    seats.  I'm not going to recess right now.  I am going to

7    ask the lawyers some questions.  You can step down.  You

8    can go back into the audience.

9              **MS. REEVES:**  Excuse me, just a minute, Your

10   Honor, could he spell his name for us.

11             **THE COURT:**  Well, we'll get it.  It's Mr.

12   Powell.

13             (Witness excused)

14             **THE COURT:**  Now that will be the evidence for

15   today.

16             What about this Charlene Johnson recantation.

17   Now it would be appropriate to ask Ms. Parks about that?

18   Where does that fit into the puzzle?

19             **MS. PARKS:**  Well, that is part of our claim, and

20   I guess the bigger picture obviously recantation is not a

21   federal issue, but due process is a federal issue; and our

22   issue involving the recantation of Charlene and now the

23   other witness is just a part of the bigger due process

24   argument.  I actually did not present that very clearly to

25   this Court in the briefs.  It is presented in lower courts

99

1   during the exhaustive hearing.

2          THE COURT:  Was the witness called under oath to

3   testify and recant?

4          MS. PARKS:  Charlene Johnson?

5          THE COURT:  Yes.

6          MS. PARKS:  Yes, Your Honor.  She was called at

7   the Motion for Appropriate Relief Hearing and we submitted

8   an affidavit.

9          THE COURT:  Did she testify as a live witness?

10         MS. PARKS:  Yes, she did.

11         THE COURT:  And what did she say?  She recanted

12  her trial testimony?

13         MS. PARKS:  Yes, Your Honor.

14         THE COURT:  At trial had she made an in court

15  positive identification of the Defendant?

16         MS. PARKS:  Yes, she did.

17         THE COURT:  Is that what she recanted?

18         MS. PARKS:  Yes, she did, Your Honor.

19         THE COURT:  How about Beatrice Stokes?  Did she

20  make an in court positive identification of the Defendant

21  at trial?

22         MS. PARKS:  Yes, she did, Your Honor.

23         THE COURT:  And did she recant that?

24         MS. PARKS:  Yes, she did, not under live

25  testimony.  An investigator working for the Sharpe family

Case 5:99-hc-00856-BO   Document 23   Filed 11/08/00   Page 21 of 24

100

1   talked to Beatrice, and she wrote down in a written
2   statement a recantation.  This was witnessed by two city
3   council members in Greenville, but it was not notarized.
4           THE COURT:  And what happened to the Johnson
5   recantation testimony?  That was presented at the Motion
6   for Appropriate Relief?
7           MS. PARKS:  Yes, Your Honor.  And Judge Duke
8   found that he -- I forget his exact language.  He wasn't
9   reasonably satisfied that she had lied at the trial and so
10  he denied that motion for appropriate relief based on the
11  recantation.
12          THE COURT:  All right.  What I am going to do,
13  based on today's proceedings, is to recess this case and
14  to have the Clerk's office contact you about a convenient
15  time and place to rehear it.  I don't think it will be
16  back here.  It will either be in Greenville or in Raleigh.
17  And I may request that a prehearing or a conference be
18  held to refine the issues and the scope of the balance of
19  the evidence before we come back and have a formal hearing
20  again to conclude the case.  I think that might be
21  worthwhile.
22          MS. REEVES:  Your Honor, could I please --
23          THE COURT:  Yes, ma'am.
24          MS. REEVES:  I would really specifically ask
25  that the Court do that because I think I understand that

Case 5:99-hc-00856-BO   Document 23-4   Filed 11/08/00   Page 22 of 24

1  Ms. Parks is basically saying that we won't go forward in
2  this setting with the recantation situation.  And I have
3  lots of reasons why I think that is the appropriate thing
4  to do, but the five witnesses I subpoenaed to Court today
5  are basically here about the recantation because
6  essentially the ineffective assistance of counsel claim
7  I think is a matter of law.
8            **THE COURT:**  Okay.
9            **MS. REEVES:**  So if we can decide ahead of time
10  that they are not necessary, that would be helpful.
11            **THE COURT:**  And what I expect right now is to at
12  a convenient time to schedule it before one of our
13  Magistrate judges and to have you appear and to conduct a
14  brief conference so that you can come up with a working
15  product for ending this case, bring it to the next stage
16  and then deciding the issues.
17            **MS. REEVES:**  Yes, sir.
18            **THE COURT:**  Thank you very much for being here
19  today.
20  ******************
21            Whereupon the hearing was concluded at 5:00
22  p.m.)
23
24
25

STATE OF NORTH CAROLINA )
) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS )

     I certify that the foregoing is a correct

transcript from the record of proceedings in the above-

entitled matter.

**SANDRA A. GRAHAM**
**NOTARY PUBLIC**
**PERQUIMANS COUNTY, NC**

_____      October 23, 2000
Sandra A. Graham, CVR
My commission expires: February 1, 2004

**S. GRAHAM & ASSOCIATES**
P.O. BOX 385
**ELIZABETH CITY, NC 27907-0385**
(919) 264-4646